UPON RECORDING RETURN TO:

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th FL.
Coral Gables, Florida 33146
Attention: Collateral Department

9312487
3/2/2005 2:25:00 PM $70.00
Book - 9100 Pg - 7811-7841
Gary W. Ott
Recorder, Salt Lake County, UT
PREFERRED TITLE & ESCROW INS.
BY: eCASH, DEPUTY - EF 31 P.

# DEED OF TRUST AND SECURITY AGREEMENT

## { UTAH }

### Hossein Rezaian and Shahram Rezaian

### as Grantor

### (Borrower)

### To

### Preferred Title

### as Trustee

### (Trustee)

### For the benefit of:

### Padron Enterprises,Inc,a California Corp, D/B/A Metwest Commercial Lender

### as Beneficiary

### (Lender)

1

EXHIBIT B

UPON RECORDING RETURN TO:

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

# DEED OF TRUST AND SECURITY AGREEMENT

## { UTAH }

**Hossein Rezaian and Shahram Rezaian**

**as Grantor**

**(Borrower)**

**To**

**Preferred Title**

**as Trustee**

**(Trustee)**

**For the benefit of:**

**Padron Enterprises,Inc,a California Corp,
D/B/A Metwest Commercial Lender**

**as Beneficiary**

**(Lender)**

EXHIBIT B
20499202

THIS DEED OF TRUST AND SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (the "Security Instrument") is made as of February 25, 2005, by Hossein Rezaian and Shahram Rezaian, having an address at 14029 Candy Pull Drive, Draper, UT 84020, as grantor ("Borrower"), to Preferred Title, as Trustee ("Trustee"), for the benefit of Padron Enterprises,Inc,a California Corp, D/B/A Metwest Commercial Lender, having an address at 13191 Crossroads Parkway N #275, City Of Industry, CA 91746, as beneficiary ("Lender").

## R E C I T A L S:

Borrower by its promissory note of even date herewith given to Lender is indebted to Lender in the principal sum of One Hundred Fifty Thousand Five Hundred and No/100 Dollars ($150,500.00) in lawful money of the United States of America (the note together with all extensions, renewals, modifications, substitutions and amendments thereof shall collectively be referred to as the "Note"), with interest from the date thereof at the rates set forth in the Note, principal and interest to be payable in accordance with the terms and conditions provided in the Note and with a maturity date of March 1, 2020.

Borrower desires to secure the payment of the Debt (hereinafter defined in Article 2) and the performance of all of it obligations under the Note and the Other Obligations (defined in Article 2).

## ARTICLE 1. - GRANTS OF SECURITY

Section 1.1.    PROPERTY IN TRUST . To secure the full and timely payment and performance of the Debt and the full and timely performance and discharge of the Other Obligations, Borrower has GRANTED, BARGAINED, SOLD and CONVEYED, and by these presents does GRANT, BARGAIN, MORTGAGE, SELL, CONVEY and CONFIRM in trust with power of sale, to the fullest extent permitted by applicable law, unto Trustee the following described "Property", subject, however, to the Permitted Exceptions (defined in Section 5.1), TO HAVE AND TO HOLD the Property unto Trustee, his successors in trust and the Trustee's assigns forever, and Borrower does hereby bind itself, its successors and assigns, to warrant and forever defend title to the Property unto Trustee against every person whomsoever lawfully claiming or to claim the same or any part thereof; provided, however, that if Borrower shall pay (or cause to be paid) the Debt as and when the same shall become due and payable and shall perform and discharge (or cause to be performed and discharged) all of the Other Obligations of Borrower under the Note and this Security Instrument and the Other Security Documents on or before the date same are to be performed and discharged, then the liens, security interests, estates and rights granted by this Security Instrument and the Other Security Documents shall terminate and be released by the Trustee, otherwise same shall remain in full force and effect. In the event of such termination and release, Trustee, shall, at the request of Lender and at the expense of Borrower, execute an instrument in writing and in recordable form reconveying the trust property to Borrower and shall otherwise release the liens, security interests, estates and rights granted by this Security Instrument and the Other Security Documents.

As used herein, the term "Property" shall mean the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "Property"):

(a)    Land . The real property described in Exhibit A attached hereto and made a part hereof (the "Land");

(b)    Additional Land . All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental deed of trust or otherwise be expressly made subject to the lien of this Security Instrument;

(c)    Improvements . The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (the "Improvements");

(d)    Easements . All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, ditches and ditch rights, wells and well rights, well permits, springs and spring rights and reservoirs and reservoir rights appurtenant to or historically used in connection with the premises and all of Trustors rights and interests under applicable state or Federal law to all water, and to use or consent to use all water, contained in or available from any part of the water bearing formations underlying the Premises, together with all associated easements and rights of way; any and all rights to obtain water, sewer and other services from service districts, water, water courses, water rights, licenses and powers, air rights, mineral rights (including but not limited to hard rock minerals, oil and gas)

EXHIBIT B

and development rights, all crops, timber, trees, shrubs, flowers and lands aping plants and materials now or hereafter located on, under or above the Premises, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, courtesy and rights of courtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)    Fixtures and Personal Property . All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) trade fixtures and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, including without limitation, letter of credit rights, deposit accounts, payment intangibles, investment property, electronic chattel paper, timber to be cut and farm animals, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Land and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Land and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Land and the Improvements (collectively, the "Personal Property"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Security Instrument, and all proceeds and products of all of the above;    ·

(f)    Leases and Rents . All leases, subleases and other agreements affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into and all extensions, amendments and modifications thereto, whether before or after the filing by or against Borrower of any petition for relief under Creditors Rights Laws (defined in Article 10) (the "Leases") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, any guaranties of the lessees' obligations thereunder, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, room revenues, accounts, accounts receivable, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Creditors Rights Laws (the "Rents") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(g)    Insurance Proceeds . All proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(h)    Condemnation Awards . All awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of the right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(i)    Tax Certiorari . All refunds, rebates or credits in connection with a reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(j)    Conversion . All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, proceeds of insurance and condemnation awards, into cash or liquidation claims;

(k)    Rights . The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee and/or Lender in the Property;

(l)    Agreements . All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence and during the

EXHIBIT B

continuance of an Event of Default (defined in Article 10), to receive and collect any sums payable to Borrower thereunder;

(m)    <u>Intangibles</u> . All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property; and

(n)    <u>Other Rights</u> . Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (m) above.

Section 1.2.    <u>ASSIGNMENT OF LEASES AND RENTS</u> . Borrower hereby absolutely and unconditionally assigns to Trustee for the benefit of Lender Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 1.2 and Section 3.8, Lender grants to Borrower a revocable license to collect and receive the Rents. Borrower shall hold a portion of the Rents sufficient to discharge all current sums due on the Debt, for use in the payment of such sums. Nothing contained in this Deed of Trust, including the Assignment of Leases and Rents, shall be construed to impose on Beneficiary any liabilities or obligations of a mortgagee in possession, unless and until Beneficiary shall have taken actual possession of the Land and Improvements in Beneficiary's own name. Without limiting the foregoing, the exercise by Beneficiary of its rights to seek the appointment of a receiver to take possession of the Property and collect Rents or to collect Rents in Beneficiary's own name directly from the parties obligated for payment under the Leases shall not constitute Beneficiary a mortgagee in possession.

Section 1.3.    <u>SECURITY AGREEMENT</u> . This Security Instrument is both a real property Deed of Trust and a "Security Agreement and Fixtures Finance Statement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (defined in Section 2.3), a first-priority lien and security interest in the Personal Property as well as all other property and interests set forth in Section 1.1 herein to the full extent that the same may be subject to the Uniform Commercial Code. If required by Lender, Borrower shall execute UCC-1 Financial Statements covering said property for filing with the appropriate count and/or state filing offices. In any event, Lender is permitted to unilaterally file a UCC-1 Financing Statement covering all of the Property. This Deed of Trust covers certain goods which are or are to become fixtures related to the Land and Improvements and CONSTITUTES A FIXTURE FILING with respect to such goods executed by Trustor as debtor infavor of the Beneficiary as secured party. For purposes of the Uniform Commercial Code, the following information is supplied:  Name and Address of Trustor/Debtor is set forth in the introductory paragraph of this Deed of Trust. Description of Land: See Exhibit "A" attached to this Deed of Trust. Name and Address of Beneficiary/Secured Party is set forth in the introductory paragrah of this Deed of Trust.

Section 1.4.    <u>PLEDGE OF MONIES HELD</u> . Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender, including, without limitation, any sums deposited in the Escrow Fund (defined in Section 3.5), Net Proceeds (defined in Section 3.7) and condemnation awards or payments described in Section 3.6, as additional security for the Obligations until expended or applied as provided in this Security Instrument.

### ARTICLE 2. - DEBT AND OBLIGATIONS SECURED

Section 2.1.    <u>DEBT</u> . This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the payment of the following, in such order of priority as Lender may determine in its sole discretion (the "Debt"):

(a)    the indebtedness evidenced by the Note in lawful money of the United States of America;

(b)    interest, default interest, late charges and other sums, as provided in the Note, this Security Instrument or the Other Security Documents (defined in Section 3.2);

(c)    the Prepayment Consideration (defined in the Note), if any;

(d)    all other monies agreed or provided to be paid by Borrower in the Note, this Security Instrument or the Other Security Documents;

EXHIBIT B
2049202

(e)    all sums advanced pursuant to this Security Instrument to protect and preserve the Property and the lien and the security interest created hereby; and

(f)    all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender.

Notwithstanding any other provision contained in this Security Instrument, the Guaranty and the Affidavit and Indemnity of Borrower (and Guarantors) Regarding Hazardous and Toxic Materials are not and shall not be deemed to be secured by this Deed of trust.

Section 2.2.    OTHER OBLIGATIONS . This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the performance of the following (the "Other Obligations"):

(a)    all other obligations of Borrower contained herein;

(b)    each obligation of Borrower contained in the Note and in the Other Security Documents; and

(c)    each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, this Security Instrument or the Other Security Documents.

Section 2.3.    DEBT AND OTHER OBLIGATIONS. Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively as the "Obligations."

Section 2.4.    PAYMENTS . Unless payments are made in the required amount in immediately available funds at the place where the Note is payable, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where the Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks; provided, however, Lender shall not be required to accept payment for any Obligation in cash. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

## ARTICLE 3. - BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1.    PAYMENT OF DEBT . Borrower will pay the Debt at the time and in the manner provided in the Note and in this Security Instrument.

Section 3.2.    INCORPORATION BY REFERENCE . All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents other than the Note or this Security Instrument now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guaranty payment of the Note or are otherwise executed and delivered in connection with the Loan (the "Other Security Documents") are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3.    INSURANCE . Borrower shall maintain with respect to the Property at all times, insurance against loss or damage by fire and other casualties and hazards by insurance written on an "all risks" basis including specifically windstorm and/or hail damage, in an amount not less than the replacement cost thereof, naming Lender as loss payee and additional insured; (ii) if the Property is required to be insured pursuant to the National Flood Reform Act of 1994, and the regulations promulgated there under, flood insurance is required in the amount equal to the lesser of the loan amount or the maximum available under the National Flood Insurance Program, but in no event should the amount of coverage be less than the value of the improved structure, naming Lender as additional insured and loss payee; and (iii) liability insurance providing coverage in such amount as Lender may require but in no event less than $1,000,000.00 naming

4

Lender as an additional insured; and (iv) such other insurances as Lender may reasonably require from time to time.

All casualty insurance policies shall contain an endorsement or agreement by the insurer in form satisfactory to Lender that any loss shall be payable in accordance with the terms of such policy notwithstanding any act of negligence of Borrower and the further agreement of the insurer waiving rights of subrogation against Lender, and rights of set-off, counterclaim or deductions against Borrower.

All insurance policies shall be in form, provide coverages, be issued by companies and be in amounts satisfactory to Lender. At least 30 days prior to the expiration of such policy, Borrower shall furnish Lender with evidence satisfactory to Lender that such policy has been renewed or replaced. All such policies shall provide that the policy will not be canceled or materially amended without at least 30 days prior written notice to Lender. In the event Borrower fails to provide, maintain, keep in force and furnish to Lender the policies of insurance in such amounts, at such premium, for such risks and by such means as Lender chooses, then Lender may procure such insurance at Borrower's sole cost and expense, provided Lender shall have no responsibility to obtain any insurance, but if Lender does obtain insurance, Lender shall have no responsibility to assure that the insurance obtained shall be adequate or provide any protection to Borrower.

In the event of a foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies then in force concerning the Property, to the extent assignable, and all proceeds payable thereunder shall thereupon vest in Lender or the purchaser at such foreclosure or other transferee in the event of such other transfer of title.

Section 3.4.    PAYMENT OF TAXES, ETC .

(a)    Borrower shall promptly pay by their initial due date all taxes, assessments, water rates, sewer rents and other governmental impositions, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Taxes") not paid from the Escrow Fund (defined in Section 3.5), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "Other Charges"), and all charges for utility services provided to the Property as same become due and payable. Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property. Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument, Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or any of the Other Security Documents, (ii) Borrower is permitted to do so under the provisions of any other deed of trust, mortgage or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Taxes from Borrower and from the Property or Borrower shall have paid all of the Taxes under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost and (vi) Borrower shall have deposited with Lender adequate reserves for the payment of the Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the Taxes under protest, or Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender to insure the payment of any contested Taxes, together with all interest and penalties thereon, taking into consideration the amount in the Escrow Fund available for payment of Taxes.

Section 3.5.    ESCROW FUND . In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall pay to Lender on the first day of each calendar month (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). Borrower agrees to notify

EXHIBIT B

Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has or obtains knowledge and authorizes Lender or its agent to obtain the bills for Taxes directly from the appropriate taxing authority. The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum by Borrower to Lender. Provided there are sufficient amounts in the Escrow Fund and no Event of Default exists, Lender shall be obligated to pay the Taxes and Insurance Premiums as they become due on their respective due dates on behalf of Borrower by applying the Escrow Fund to the payments of such Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.3 and 3.4. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.3 and 3.4, Lender shall, in its discretion, return any excess to Borrower in accordance with all applicable laws or credit such excess against future payments to be made to the Escrow Fund. In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property. If the Escrow Fund is not sufficient to pay the items set forth in (a) and (b) above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall reasonably estimate as sufficient to make up the deficiency. The Escrow Fund shall not constitute a trust fund and, unless prohibited by law, may be commingled with other monies held by Lender. Unless otherwise required by applicable state or federal law, no earnings or interest on the Escrow Fund shall be payable to Borrower.

Section 3.6.   CONDEMNATION . Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including, but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Security Instrument and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided in the Note. Borrower shall cause the award or payment made in any condemnation or eminent domain proceeding, which is payable to Borrower, to be paid directly to Lender. Lender may apply any award or payment to the reduction or discharge of the Debt whether or not then due and payable. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt.

Section 3.7.   RESTORATION AFTER CASUALTY.

(a)   In the event of loss, Borrower shall give immediate written notice to the insurance carrier and to Lender. Borrower hereby authorizes and appoints Lender as attorney?in?fact for Borrower to make proof of loss, to adjust and compromise any claims under policies of property damage insurance, to appear in and prosecute any action arising from such property damage insurance policies, to collect and receive the proceeds of property damage insurance, and to deduct from such proceeds Lender's expenses incurred in the collection of such proceeds. This power of attorney is coupled with an interest and therefore is irrevocable. However, nothing contained in this Section 3.7 shall require Lender to incur any expense or take any action. Lender may, at Lender's option, (1) hold the balance of such proceeds to be used to reimburse Borrower for the cost of restoring and repairing the Property to the equivalent of its original condition or to a condition approved by Lender (the "Restoration"), or (2) apply the balance of such proceeds to the payment of the Debt, whether or not then due. To the extent Lender determines to apply insurance proceeds to Restoration, Lender shall do so in accordance with Lender's then-current policies relating to the restoration of casualty damage on similar properties.

(b)   Lender shall not exercise its option to apply insurance proceeds to the payment of the Debt if all of the following conditions are met: (1) no Event of Default (or any event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default) has occurred and is continuing; (2) Lender determines, in its discretion, that there will be sufficient funds to complete the Restoration; (3) Lender determines, in its discretion, that the net cash flow from the Property after completion of the Restoration will be sufficient to meet all operating costs and other expenses, deposits to the Escrow Fund, deposits to reserves and loan repayment obligations relating to the Property; (4) Lender determines, in its discretion, that the Restoration will be completed before the earlier of (A) one year before the maturity date of the Note or (B) one year after the date of the loss or casualty; and (5) upon Lender's request, Borrower provides Lender evidence of the availability during and after the Restoration of the insurance required to be maintained by Borrower pursuant to Section 3.3.

Section 3.8.   LEASES AND RENTS . Borrower shall maintain, enforce and cause to be performed all of the terms

EXHIBIT B

and conditions under any Lease or sublease, which may constitute a portion of the Property. Borrower shall not, without the consent of Lender enter into any new Lease of all or any portion of the Property, agree to the cancellation or surrender under any Lease of all or any portion of the Property, agree to prepayment of Rents, issues or profits (other than Rent paid at the signing of a lease or sublease), modify any such Lease so as to shorten the term, decrease the Rent, accelerate the payment of Rent, or change the terms of any renewal option, provided that such action (taking into account, in the case of a termination, reduction in rent, surrender of space or shortening of term, the planned alternative use of the affected space) does not have a materially adverse effect on the value of the Property taken as a whole, and provided that such Lease, as amended, modified or waived, is otherwise in compliance with the requirements of this Security Instrument and any subordination agreement binding upon Lender with respect to such Lease. Any such purported new Lease, cancellation surrender, prepayment or modification made without the written consent of Lender shall be void as against Lender.

Section 3.9.    <u>MAINTENANCE AND USE OF PROPERTY</u> . Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Personal Property) without the consent of Lender. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any condemnation or taking proceeding and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or the nonconforming Improvement to be abandoned without the express written consent of Lender.

Section 3.10.    <u>WASTE</u> . Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property or the security of this Security Instrument. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.11.    <u>COMPLIANCE WITH LAWS</u> .

(a)    Borrower shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting the Property, or the use thereof, including Environmental Law (defined in Section 12.1) ("Applicable Laws").

(b)    Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that the Property complies with all Applicable Laws or is exempt from compliance with Applicable Laws.

(c)    Notwithstanding any provisions set forth herein or in any document regarding Lender's approval of alterations of the Property, Borrower shall not alter the Property in any manner which would materially increase Borrower's responsibilities for compliance with Applicable Laws without the prior written approval of Lender. Lender's approval of the plans, specifications, or working drawings for alterations of the Property shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Applicable Laws. The foregoing shall apply to tenant improvements constructed by Borrower or by any of its tenants. Lender may condition any such approval upon receipt of a certificate of compliance with Applicable Laws from an independent architect, engineer, or other person acceptable to Lender.

(d)    Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation or any threatened violation of any Applicable Laws and of the commencement or threatened commencement of any proceedings or investigations which relate to compliance with Applicable Laws.

(e)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the Applicable Laws affecting the Property, provided that (i) no Event of Default has occurred and is continuing under the Note, this Security Instrument or

EXHIBIT B

any of the Other Security Documents; (ii) Borrower is permitted to do so under the provisions of any other deed of trust, mortgage or deed to secure debt affecting the Property; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower or the Property is subject and shall not constitute a default thereunder; (iv) neither the Property, any part thereof or interest therein, any of the tenants or occupants thereof, nor Borrower shall be affected in any material adverse way as a result of such proceeding; (v) non-compliance with the Applicable Laws shall not impose civil or criminal liability on Borrower or Lender; and (vi) Borrower shall have furnished to Lender all other items reasonably requested by Lender.

Section 3.12.    <u>BOOKS AND RECORDS</u> .

( a)    Borrower shall keep and maintain at all times at the Property or the management agent's offices, and upon Lender's request shall make available at the Property, complete and accurate books of account and records (including copies of supporting bills and invoices) adequate to reflect correctly the operation of the Property, and copies of all written contracts, Leases, and other instruments which affect the Property. Following a default by Borrower, the books, records, contracts, Leases and other instruments shall be subject to examination and inspection at any reasonable time by Lender.

(b)    Following a default by Borrower, Borrower shall furnish to Lender all of the following:

(1)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, a statement of income and expenses for Borrower's operation of the Property for that fiscal year, a statement of changes in financial position of Borrower relating to the Property for that fiscal year and, when requested by Lender, a balance sheet showing all assets and liabilities of Borrower relating to the Property as of the end of that fiscal year;

(2)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a rent schedule for the Property showing the name of each tenant, and for each tenant, the space occupied, the lease expiration date, the rent payable for the current month, the date through which rent has been paid, and any related information requested by Lender;

(3)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, an accounting of all security deposits held pursuant to all Leases, including the name of the institution (if any) and the names and identification numbers of the accounts (if any) in which such security deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to access information regarding such accounts;

(4)    within ten (10) days following Lender's written request and thereafter annually within 120 days after the end of each fiscal year of Borrower, and at any other time upon Lender's request, a statement that identifies all owners of any interest in Borrower and the interest held by each, if Borrower is a corporation, all officers and directors of Borrower, and if Borrower is a limited liability company, all managers who are not members;

(5)    within ten (10) days following Lender's written request and thereafter monthly a property management report for the Property, showing the number of inquiries made and rental applications received from tenants or prospective tenants and deposits received from tenants and any other information requested by Lender;

(6)    within ten (10) days following Lender's written request and thereafter monthly a balance sheet, a statement of income and expenses for Borrower and a statement of changes in financial position of Borrower for Borrower's most recent fiscal year; and

(7)    within ten (10) days following Lender's written request and thereafter monthly a statement of income and expense for the Property for the prior month or quarter.

(c)    Each of the statements, schedules and reports required hereunder shall be certified to be complete and accurate by an individual having authority to bind Borrower, and shall be in such form and contain such detail as Lender may reasonably require; provided that Lender, in Lender's sole discretion, may require that any statements,

EXHIBIT B
2049202

schedules or reports be audited at Borrower's expense by independent certified public accountants acceptable to Lender.

(d)       If Borrower fails to provide in a timely manner the statements, schedules and reports required hereunder, Lender shall have the right to have Borrower's books and records audited, at Borrower's expense, by independent certified public accountants selected by Lender in order to obtain such statements, schedules and reports, and all related costs and expenses of Lender shall become immediately due and payable and shall become an additional part of the Debt.

(e)       If an Event of Default has occurred and is continuing, Borrower shall deliver to Lender upon written demand all books and records relating to the Property or its operation.

(f)       Borrower authorizes Lender to obtain a credit report on Borrower at any time.

(g)       Borrower, any Guarantor and any Indemnitor shall furnish Lender with such other additional financial or management information (including State and Federal tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender.

(h)       Borrower, any Guarantor and any Indemnitor shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records.

Section 3.13.    PAYMENT FOR LABOR AND MATERIALS . Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests hereof, except for the Permitted Exceptions (defined below).

Section 3.14.    PERFORMANCE OF OTHER AGREEMENTS . Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

Section 3.15.    CHANGE OF NAME, IDENTITY OR STRUCTURE . Except as may be permitted under Article 8, Borrower will not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure or jurisdiction where the Borrower is organized without notifying the Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure or jurisdiction where Borrower is organized, without first obtaining the prior written consent of the Lender.

Section 3.16.    EXISTENCE . Borrower will continuously maintain (a) its existence and shall not dissolve or permit its dissolution, (b) its rights to do business in the state where the Property is located and (c) its franchises and trade names.

Section 3.17.    MANAGEMENT . The Property shall be managed by either: (a) Borrower or an entity affiliated with Borrower approved by Lender for so long as Borrower or said affiliated entity is managing the Property in a first class manner; or (b) a professional property management company approved by Lender. Management by an affiliated entity or a professional property management company shall be pursuant to a written agreement approved by Lender. Following a default by Borrower, no manager shall be removed or replaced or the terms of any management agreement modified or amended without the prior written consent of Lender. In the event (x) of default hereunder or under any management contract then in effect, which default is not cured within any applicable grace or cure period or (y) of the bankruptcy or insolvency of the manager, Lender shall have the right to immediately terminate, or to direct Borrower to immediately terminate, such management contract and to retain, or to direct Borrower to retain, a new management agent approved by Lender. All Rents generated by or derived from the Property shall first be utilized solely for current expenses directly attributable to the ownership and operation of the Property, including, without limitation, current expenses relating to Borrower's liabilities and obligations with respect to the Note, this Security Instrument and the Other Security Documents, and none of the Rents generated by or derived from the Property shall be diverted by Borrower and utilized for any other purpose unless all such current expenses attributable to the ownership and operation of the Property have

EXHIBIT B

been fully paid and satisfied.

Section 3.18.        PRINCIPAL PLACE OF BUSINESS . In the event that Borrower shall change the principal place of business or chief executive office, or, in the event Borrower is one or more natural persons, the location of its permanent residence, all as set forth in Subsection 5.18 below, Borrower shall immediately notify Lender in writing. Borrower shall execute and deliver such additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Lender's security interest in the Property as a result of such change of principal place of business or residence.

## ARTICLE 4. - SPECIAL COVENANTS

Intentionally Deleted.

## ARTICLE 5. - REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lender that:

Section 5.1.        WARRANTY OF TITLE . Borrower has good and marketable title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and that Borrower is seized of an unencumbered fee simple absolute estate in the Land and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Security Instrument (the "Permitted Exceptions"). Borrower shall forever warrant, defend and preserve the title and the validity and priority of the lien of this Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

Section 5.2.        LEGAL STATUS AND AUTHORITY . Borrower (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) is duly qualified to transact business and is in good standing in the state where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, operate and lease the Property. Borrower (and the undersigned representative of Borrower, if any) has full power, authority and legal right to execute this Security Instrument, and to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the Property pursuant to the terms hereof and to keep and observe all of the terms of this Security Instrument on Borrower's part to be performed.

Section 5.3.        VALIDITY OF DOCUMENTS .

(a)        The execution, delivery and performance of the Note, this Security Instrument and the Other Security Documents and the borrowing evidenced by the Note (i) are within the power and authority of Borrower; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a material default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership or trust agreement, articles of organization, operating agreement, or other governing instrument of Borrower, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except for the recordation of this Security Instrument in appropriate land records in the State where the Property is located and except for Uniform Commercial Code filings relating to the security interest created hereby), and (b) to the best of Borrower's knowledge, the Note, this Security Instrument and the Other Security Documents constitute the legal, valid and binding obligations of Borrower, enforceable in accordance with their terms.

Section 5.4.        LITIGATION . There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against Borrower, a Guarantor, if any, an Indemnitor, if any, or against or affecting the Property that has not been disclosed to Lender by Borrower in writing and as determined by Lender in its sole and absolute discretion (a) has a material, adverse affect on the Property or Borrower's, any Guarantor's or any Indemnitor's ability to perform its obligations under the Note, this Security Instrument or the Other Security Documents, or (b) is not adequately covered by insurance.

EXHIBIT B
20492202

Section 5.5.    <u>STATUS OF PROPERTY</u> .

(a)    Borrower has obtained all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which are in full force and effect as of the date hereof and not subject to revocation, suspension, forfeiture or modification.

(b)    The Property and the present and contemplated use and occupancy thereof are in full compliance with all applicable zoning ordinances, building codes, land use laws, Environmental Laws and other similar laws.

(c)    The Property is served by all utilities required for the current or contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

(d)    All public roads and streets necessary for service of and access to the Property for the current or contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public.

(e)    The Property is served by public water and sewer systems.

(f)    The Property is free from damage caused by fire or other casualty.

(g)    All costs and expenses of any and all labor, materials, supplies and equipment used in the construction of the Improvements have been paid in full.

(h)    Borrower has paid in full for, and is the owner of, all furnishings, fixtures and equipment (other than tenants' property) used in connection with the operation of the Property, free and clear of any and all security interests, liens or encumbrances, except the lien and security interest created hereby.

(i)    All liquid and solid waste disposal, septic and sewer systems located on the Property are in a good and safe condition and repair and in compliance with all Applicable Laws.

(j)    No portion of the Improvements is located in an area identified by the Federal Emergency Management Agency or any successor thereto as an area having special flood hazards pursuant to the Flood Insurance Acts or, if any portion of the Improvements is located within such area, Borrower has obtained and will maintain the insurance required pursuant to the terms hereof.

(k)    All the Improvements lie within the boundaries of the Land.

(l)    The Land is one or both of the following as of the date hereof: (i) a parcel of real property not exceeding forty (40) acres; or (ii) is located within the boundaries of an incorporated city or village.

Section 5.6.    <u>NO FOREIGN PERSON</u> .  Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations.

Section 5.7.    <u>SEPARATE TAX LOT</u> .  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of such lot or lots, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 5.8.    <u>LEASES</u> .  Except as disclosed in the rent roll for the Property delivered to and approved by Lender, (a) Borrower is the sole owner of the entire lessor's interest in the Leases; (b) the Leases are valid and enforceable and in full force and effect; (c) all of the Leases are arms-length agreements with bona fide, independent third parties; (d) no party under any Lease is in default; (e) all Rents due have been paid in full; (f) the terms of all alterations, modifications and amendments to the Leases are reflected in the certified occupancy statement delivered to and approved by Lender; (g) none of the Rents reserved in the Leases have been assigned or otherwise pledged or hypothecated; (h) none of the Rents have been collected for more than one (1) month in advance (except a security deposit shall not be deemed rent collected in advance); (i) the premises demised under the Leases have been completed and the tenants under the Leases have

EXHIBIT B
2049202

accepted the same and have taken possession of the same on a rent-paying basis; (j) there exist no offsets or defenses to the payment of any portion of the Rents and Borrower has no monetary obligation to any tenant under any Lease; (k) Borrower has received no notice from any tenant challenging the validity or enforceability of any Lease; (l) there are no agreements with the tenants under the Leases other than expressly set forth in each Lease; (m) the Leases are valid and enforceable against Borrower and the tenants set forth therein; (n) no Lease contains an option to purchase, right of first refusal to purchase, right of first refusal to relet, or any other similar provision; (o) no person or entity has any possessory interest in, or right to occupy, the Property except under and pursuant to a Lease; (p) each Lease is subordinate to this Security Instrument, either pursuant to its terms or a recordable subordination agreement; (q) no Lease has the benefit of a non-disturbance agreement that would be considered unacceptable to prudent institutional lenders; (r) all security deposits relating to the Leases reflected on the certified rent roll delivered to Lender have been collected by Borrower; and (s) no brokerage commissions or finders fees are due and payable regarding any Lease.

Section 5.9.    FINANCIAL CONDITION .

(a)    (i) Borrower is solvent, and no proceeding under Creditors Rights Laws hereinafter defined with respect to Borrower has been initiated, and (ii) Borrower has received reasonably equivalent value for the granting of this Security Instrument.

(b)    No petition in bankruptcy has been filed by or against Borrower, any Guarantor, any Indemnitor or any related entity, or any principal, general partner or member thereof, in the last seven (7) years, and neither Borrower, any Guarantor, any Indemnitor nor any related entity, or any principal, general partner or member thereof, in the last seven (7) years has ever made any assignment for the benefit of creditors or taken advantage of any Creditors Rights Laws.

Section 5.10.    BUSINESS PURPOSES .  The loan evidenced by the Note secured by the Security Instrument and the Other Security Documents (the "Loan") is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 5.11.    TAXES .  Borrower, any Guarantor and any Indemnitor have filed all federal, state, county, municipal, and city income, personal property and other tax returns required to have been filed by them and have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower, any Guarantor nor any Indemnitor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

Section 5.12.    MAILING ADDRESS .  Borrower's mailing address, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

Section 5.13.    NO CHANGE IN FACTS OR CIRCUMSTANCES .  All information in the application for the Loan submitted to Lender and in all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the application or in satisfaction of the terms thereof, are accurate, complete and correct in all respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading.

Section 5.14.    DISCLOSURE .  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 5.15.    THIRD PARTY REPRESENTATIONS .  Each of the representations and the warranties made by each Guarantor and Indemnitor in any Other Security Document(s) is true and correct in all material respects.

Section 5.16.    ILLEGAL ACTIVITY .  No portion of the Property has been or will be purchased, improved, equipped or furnished with proceeds of any illegal activity and to the best of Borrower's knowledge, there are no illegal activities or activities relating to controlled substances at the Property.

Section 5.17.    PERMITTED EXCEPTIONS .  None of the Permitted Exceptions, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Instrument, the Note, and the Other Security Documents, materially and adversely affect the value of the Property, impair the use or the operation of the Property or impair Borrower's ability to pay its obligations in a timely manner.

EXHIBIT B

Section 5.18.    <u>PRINCIPAL PLACE OF BUSINESS</u> . Borrower's principal place of business is as of the date hereof the address set forth in the opening paragraph of this Security Instrument.

Section 5.19.    <u>PROPERTY USE</u> . The Property shall continue to be used in accordance with its present use, and for no other use without the prior written consent of Lender.

## ARTICLE 6. - OBLIGATIONS AND RELIANCE

Section 6.1.    <u>RELATIONSHIP OF BORROWER AND LENDER</u> . The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, this Security Instrument and the Other Security Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 6.2.    <u>NO RELIANCE</u>. The members, general partners, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 6.3.    <u>NO LENDER OBLIGATIONS</u>. Notwithstanding anything to the contrary contained in this Security Instrument, the provisions of Subsections 1.1(f) and (l) and Section 1.2, Lender is not undertaking the performance of (a) any obligations under the Leases; or (b) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents. By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Note or the Other Security Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 6.4.    <u>RELIANCE</u>. Borrower recognizes and acknowledges that in accepting the Note, this Security Instrument and the Other Security Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article 5 and Article 12 without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Security Instrument and the Other Security Documents; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article 5 and Article 12.

## ARTICLE 7. - FURTHER ASSURANCES

Section 7.1.    <u>RECORDING OF SECURITY INSTRUMENT, ETC</u>. Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the Other Security Documents creating a lien or security interest or evidencing the lien or security interest hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the Other Security Documents, any note, mortgage or deed of trust supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any mortgage, deed of trust supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

Section 7.2.    <u>FURTHER ACTS, ETC</u>. Borrower will, at the cost of Borrower, and without expense to Lender or Trustee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, deeds of trust, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Trustee for the benefit of Lender and to Lender directly, as applicable, the Property and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may

EXHIBIT B
2049202

hereafter become bound to convey or assign to Trustee or Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all applicable state or federal law. Borrower, on demand, will execute and deliver and hereby authorizes Lender, following 10 days' notice to Borrower, to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence or perfect more effectively the security interest of Lender in the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender pursuant to this Section 7.2.

Section 7.3.    CHANGES IN TAX, DEBT CREDIT AND DOCUMENTARY STAMP LAWS.

(a)    If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(b)    Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, exercisable by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the Other Security Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 7.4.    ESTOPPEL CERTIFICATES.

(a)    After request by Lender, Borrower, within ten (10) days, shall furnish Lender or any proposed assignee with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the terms of payment and maturity date of the Note, (v) the date installments of interest and/or principal were last paid, (vi) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an event of default under the Note or the Security Instrument, (vii) that the Note and this Security Instrument are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the obligations secured hereby and, if any are alleged to exist, a detailed description thereof, (ix) that all Leases are in full force and effect and (provided the Property is not a residential multifamily property) have not been modified (or if modified, setting forth all modifications), (x) the date to which the Rents thereunder have been paid pursuant to the Leases, (xi) whether or not, to the best knowledge of Borrower, any of the lessees under the Leases are in default under the Leases, and, if any of the lessees are in default, setting forth the specific nature of all such defaults, (xii) the amount of security deposits held by Borrower under each Lease and that such amounts are consistent with the amounts required under each Lease, and (xiii) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the obligations secured hereby, the Property or this Security Instrument.

(b)    Borrower shall use its best efforts to deliver to Lender, promptly upon request, duly executed estoppel certificates from any one or more lessees as required by Lender attesting to such facts regarding the Lease as Lender may require, including, but not limited to attestations that each Lease covered thereby is in full force and effect with no defaults thereunder on the part of any party, that none of the Rents have been paid more than one month in advance, except as security, and that the lessee claims no defense or offset against the full and timely performance of its obligations under the Lease.

(c)    Upon any transfer or proposed transfer contemplated by Section 17.1, at Lender's request, Borrower, any Guarantors and any Indemnitor(s) shall provide an estoppel certificate to the Investor (defined in Section 17.1) or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may require.

EXHIBIT B

Section 7.5.    FLOOD INSURANCE.  After Lender's request, Borrower shall deliver evidence satisfactory to Lender that no portion of the Improvements is situated in a federally designated "special flood hazard area" or, if it is, that Borrower has obtained insurance meeting the requirements of Section 3.3.

Section 7.6.    REPLACEMENT DOCUMENTS.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any Other Security Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or Other Security Document, Borrower will issue, in lieu thereof, a replacement Note or Other Security Document, dated the date of such lost, stolen, destroyed or mutilated Note or Other Security Document in the same principal amount thereof and otherwise of like tenor.

### ARTICLE 8. - DUE ON SALE/ENCUMBRANCE

Section 8.1.    TRANSFER DEFINITIONS.  For purposes of this Article 8, an "Affiliated Manager" shall mean any managing agent in which Borrower, any Guarantor or Indemnitor has, directly or indirectly, any legal, beneficial or economic interest; a "Restricted Party" shall mean Borrower, any Guarantor, any Indemnitor, or any Affiliated Manager or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Guarantor, any Indemnitor, any Affiliated Manager or any non-member manager; and a "Sale" shall mean a voluntary or involuntary sale, conveyance, transfer or pledge of a legal or beneficial interest.

Section 8.2.    NO SALE/ENCUMBRANCE.

(a)    Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein (collectively a "Transfer"), other than pursuant to Leases of space in the Improvements to tenants in accordance with the provisions of Section 3.8, without the prior written consent of Lender.

(b)    A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions, by which such corporation's stock shall be vested in a party or parties who are not now shareholders; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or the creation or issuance of new limited partnership interests in one or a series of transactions, by which such limited partnership interests shall be vested in a party or parties who are not now limited partners; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests in one or a series of transactions, by which such non-managing membership interests shall be vested in a party or parties who are not now non-managing members; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests in one or a series of transactions, by which such beneficial or legal interests shall be vested in a party or parties who are not now legal or beneficial owners; or (vii) the removal or the resignation of the managing agent (including, without limitation, an Affiliated Manager) other than in accordance with Section 3.17.

Section 8.3.    PERMITTED TRANSFERS.  Notwithstanding the provisions of Sections 8.1 and 8.2, the following transfers shall not be deemed to be a Transfer: (a) a transfer by devise or descent or by operation of law upon the death of a member, partner or shareholder of a Restricted Party; and (b) the Sale or Pledge of stock or limited partnership or non-managing membership interests in a Restricted Party by which, in one or a series of transactions, in the aggregate, not more than forty-nine percent (49%) of the stock, limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party, shall be vested in parties not now having an ownership interest; provided, however, no such transfer shall result in the change of voting control in the Restricted Party, and as a condition to each such transfer, Lender shall receive not less than ten (10) days prior written notice of such proposed transfer.

EXHIBIT B

Section 8.4.     ONE-TIME TRANSFER RIGHT.  Notwithstanding anything to the contrary contained in this Article 8, and in addition to the transfers permitted hereunder, Lender may (subject to Lender's sole discretion) permit a one-time sale, assignment, or other transfer of the Property; provided that Lender receives sixty (60) days prior written notice of such transfer hereunder; no Event of Default has occurred and is continuing; and the following additional requirements are satisfied:

(a)     Borrower shall pay Lender a transfer fee equal to 2% of the outstanding principal balance of the Loan at the time of such transfer;

(b)     Borrower shall pay any and all out-of-pocket costs incurred in connection with the transfer of the Property (including, without limitation, Lender's counsel fees and disbursements and all recording fees, title insurance premiums and mortgage and intangible taxes);

(c)     The proposed transferee (the "Transferee") or Transferee's principals must have demonstrated expertise in owning and operating properties similar in location, size and operation to the Property, which expertise shall be determined by Lender, in Lender's sole discretion;

(d)     Transferee and Transferee's principals shall, as of the date of such transfer, have an aggregate net worth and liquidity acceptable to Lender, in Lender's sole discretion;

(e)     Transferee shall assume all of the obligations of Borrower under the Loan Documents in all respects, including, without limitation, by entering into an assumption agreement in form and substance satisfactory to Lender (in Lender's sole discretion) and one or more Transferee's principals shall execute in favor of Lender a Guaranty and an Affidavit and Indemnity of Borrower and Guarantor Regarding Hazardous and Toxic Materials;

(f)     No Event of Default or event which, with the giving of notice, passage of time or both, shall constitute an Event of Default, shall otherwise occur as a result of such transfer, and Transferee and Transferee's principals shall deliver (A) all organization documentation requested by Lender, which shall be satisfactory to Lender (in Lender's sole discretion), and (B) all certificates, agreements and covenants required by Lender;  and

(g)     Borrower shall deliver, at its sole cost and expense, an endorsement to the existing title policy insuring the Security Instrument, as modified by the assumption agreement, as a valid first lien on the Property and naming the Transferee as owner of the Property, which endorsement shall insure that, as of the date of the recording of the assumption agreement, the Property shall not be subject to any additional exceptions or liens other than those contained in the title policy issued on the date hereof.

### ARTICLE 9. - PREPAYMENT

Section 9.1.     PREPAYMENT BEFORE EVENT OF DEFAULT.  The Debt may not be prepaid in whole or in part except in strict accordance with the express terms and conditions of the Note.

Section 9.2.     PREPAYMENT ON CASUALTY/CONDEMNATION AND CHANGE IN TAX AND DEBIT CREDIT LAWS.  Provided no Event of Default exists under the Note, this Security Instrument or the Other Security Documents, in the event of any prepayment of the Debt pursuant to the terms of Sections 3.7 or 7.3, no Prepayment Consideration shall be due in connection therewith, but Borrower shall be responsible for all other amounts due under the Note, this Security Instrument and the Other Security Documents.

Section 9.3.     PREPAYMENT AFTER EVENT OF DEFAULT.  If a Default Prepayment (defined below) occurs, Borrower shall pay to Lender, to the extent permitted by law, the amounts set forth in the Note.  For purposes of this Section 9.3, the term "Default Prepayment" shall mean a prepayment of the principal amount of the Note made after the occurrence of any Event of Default or an acceleration of the Maturity Date under any circumstances, including, without limitation, a prepayment occurring in connection with foreclosure proceedings or exercise of any applicable power of sale, any statutory right of redemption exercised by Borrower or any other party having a statutory right to redeem or cure or prevent foreclosure, any sale in foreclosure or under exercise of any applicable power of sale, deed-in-lieu of foreclosure or otherwise.

### ARTICLE 10. - DEFAULT

EXHIBIT B
2049202

Section 10.1.    EVENTS OF DEFAULT.  The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    if any portion of the Debt is not paid on or prior to the date the same is due or if the entire Debt is not paid on or before the Maturity Date;

(b)    if any of the Taxes or Other Charges is not paid when the same is due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Security Instrument;

(c)    if Borrower fails to repay any sum owed to Lender or its successor or assignee under the terms of any other Security Instrument, promissory note or other loan document in connection with any other loan; provided that such failure to repay shall constitute an Event of Default hereunder only if the person or entity to which payment is owed under such other Security Instrument, promissory note or other loan document is the holder of the Note;

(d)    if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender as provided in Section 3.3;

(e)    if Borrower violates or does not comply with any of the provisions of Article 8;

(f)    if any representation or warranty of Borrower, any Indemnitor or any person guaranteeing payment of the Debt or any portion thereof or performance by Borrower of any of the terms of this Security Instrument (a "Guarantor"), or any member, general partner, principal or beneficial owner of any of the foregoing, made herein or in any guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(g)    if (i) Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors ("Creditors Rights Laws"), seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) the Borrower or any managing member or general partner of Borrower or any Guarantor or Indemnitor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any managing member or general partner of Borrower, or any Guarantor or Indemnitor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(h)    if Borrower shall be in default beyond applicable notice and grace periods under any other deed of trust, mortgage, deed to secure debt or other security agreement covering any part of the Property whether it be superior or junior in lien to this Security Instrument;

(i)    if the Property becomes subject to any mechanic's, materialman's or other lien other than a lien for any Taxes not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days;

(j)    if any federal tax lien is filed against Borrower, any member or general partner of Borrower, any Guarantor, any Indemnitor or the Property and same is not discharged of record within thirty (30) days after same is filed;

17

EXHIBIT B

(k)      if any default occurs under any guaranty or indemnity executed in connection herewith, and such default continues after the expiration of applicable grace periods, if any; or

(l)      if for more than ten (10) days after notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Security Instrument or the Other Security Documents in the case of any default which can be cured by the payment of a sum of money or for thirty (30) days after notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days.

## ARTICLE 11. - RIGHTS AND REMEDIES

Section 11.1.      REMEDIES.  Upon the occurrence of any Event of Default, Borrower agrees that Lender or Trustee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower in and to the Property, including, but not limited to the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)      declare the entire unpaid Debt to be immediately due and payable;

(b)      by and through the Trustee or otherwise, sell or offer for sale the Property in such portions, order and parcels as Lender may determine, with or without having first taken possession of same, to the highest bidder for cash at public auction, as more particularly described hereinafter;

(c)      institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable state or federal law in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(d)      the Trustee may sell all or any portion of the Property together or in lots or parcels and in such manner and order as the Trustee, in its sole discretion, may elect.  The sale or sales by the Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and the Trustee is specifically empowered to make successive sale or sales under such power until the whole of the Property shall be sold; and if the proceeds of such sale or sales of less than the whole of such Property shall be less than the aggregate of the Debt and the expense of executing this trust, this Security Instrument and the lien, security interest and assignment hereof shall remain in full force and effect, to the extent allowed by applicable law, as to the unsold portion of the Property just as though no sale or sales had been made; provided, however, that Borrower shall never have any right to require the sale or sales of less than the whole of the Property, but Lender shall have the right, at its sole election, to request the Trustee to sell less than the whole of the Property.  As among the various counties in which items of the Property may be situated, sales in such counties may be conducted in any order that the Trustee may deem expedient and any one or more of such sales may be conducted in the same month, or in successive or different months, as the Trustee may deem expedient.  If an Event of Default shall occur hereunder, the holder of the Debt or any part thereof on which the payment is delinquent shall have the option, to the extent allowed by applicable law, to proceed as if under a full foreclosure, conducting the sale as herein provided without declaring the entire Debt due, and if sale is made because of default of an installment, or a part of an installment, such sale may be made subject to the unmatured part of the Note and the Debt; and such sale, if so made, shall not in any manner affect the unmatured part of the Debt but as to such unmatured part, this Security Instrument shall remain in full force and effect as though no sale had been made under the provisions of this Section.  In such event, any number of sales may be made hereunder without exhausting the right of sale for any unmatured part of the Debt secured hereby;

(e)      institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note or in the Other Security Documents;

(f)      recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the Other Security Documents;

(g)      apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and

EXHIBIT B
2049202

without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, Indemnitor or of any person, firm or other entity liable for the payment of the Debt;

(h)    subject to any applicable state or federal law, the license granted to Borrower under Section 1.2 shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all rent rolls, leases (including the form lease) and amendments and exhibits, subleases (including the form sublease) and amendments and exhibits and rental and license agreements with the tenants, subtenants and licensees in possession of the Property or any part or parts thereof; tenants', subtenants' and licensees' money deposits or other property (including, without limitation, any letter of credit) given to secure tenants', subtenants' and licensees' obligations under leases, subleases or licenses, together with a list of the foregoing; all lists pertaining to current rent and license fee arrears; any and all architects' plans and specifications, licenses and permits, documents, books, records, accounts, surveys and property which relate to the management, leasing, operation, occupancy, ownership, insurance, maintenance, or service of or construction upon the Property and Borrower agrees to surrender possession thereof and of the Property to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) either require Borrower (A) to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower, or (B) to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vi) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)    exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Personal Property, and (ii) request Borrower at its expense to assemble the Personal Property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)    apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Security Instrument or any Other Security Document to the payment of the following items in any order in its sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of the Note; (iv) amortization of the unpaid principal balance of the Note; and (v) all other sums payable pursuant to the Note, this Security Instrument and the Other Security Documents, including, without limitation, advances made by Lender pursuant to the terms of this Security Instrument;

(k)    surrender the Policies maintained pursuant to Article 3, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender as agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) for Borrower to collect such unearned Insurance Premiums;

(l)    apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion; or

(m)    pursue such other remedies as Lender may have under applicable state or federal law.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority to the extent allowed by law. Notwithstanding the provisions of this Section 11.1 to the contrary, if any Event of

19

EXHIBIT B

Default shall occur, and the Lender elects to declare, as described in clause (i) or (ii) of Subsection 10.1(f) shall occur, the entire unpaid Debt shall be automatically due and payable, such remedy may be pursued without any further notice, demand or other action by Lender.

Section 11.2.    <u>FORECLOSURE</u>.

(a)    Upon the occurrence of an Event of Default, the entire balance of the Loan, including all accrued interest, shall, at the option of the Lender, become immediately due and payable. Upon failure to pay the Loan in full at any stated or accelerated maturity date, the Lender may direct the Trustee to sell the land and any or all other assets or interests which constitute the Property, pursuant to the power of sale hereby granted or by judicial proceeding.

(b)    The Trustee is hereby granted a power of sale and may sell the Land (together with the Rents and Profits and Intangible Personalty), or such part or parts thereof or interests therein as the Lender may select after first having given and recorded such notice of default then may be required by law and then having given such notice and advertised the time and place of such sale in such manner as then may be provided by law, and upon such sale and any resale and upon compliance with the law then relating to foreclosure proceedings, to convey title to the Purchaser.

(c)    Following a foreclosure sale, the Trustee shall deliver to the Purchaser the Trustee's deed (and bill of sale as to any personalty) conveying the property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the statements made therein. The Trustee shall apply the proceeds of such sale in the following order: (i) to all costs and expenses of the sale, including but not limited to, reasonable Trustee's fees of not more than three percent (3%) of the gross sales price and costs of title evidence; (ii) to all sums secured by this Deed of Trust; and (iii) the excess, if any, to the person or persons legally entitled thereto.

(d)    If a foreclosure proceeding is commenced by the Trustee but terminated prior to its completion, the Trustee's fees will be reasonable but not more than one percent (1%) of the Loan obligation if the termination occurs prior to the first public auction sale and not more than two percent (2%) of the Loan obligation if the termination occurs after the first public auction sale.

Section 11.3.    <u>APPLICATION OF PROCEEDS</u>. The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the Other Security Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 11.4.    <u>RIGHT TO CURE DEFAULTS</u>. Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt. The cost and expense of any cure hereunder (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 11.4, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate (defined in the Note), for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the Other Security Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 11.5.    <u>ACTIONS AND PROCEEDINGS</u>. Lender has the right to appear in and defend any action or proceeding brought with respect to the Property, and after the occurrence and during the continuance of an Event of Default, to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 11.6.    <u>RECOVERY OF SUMS REQUIRED TO BE PAID</u>. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an

EXHIBIT B

action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 11.7.    EXAMINATION OF BOOKS AND RECORDS. Following a default by Borrower, Lender, its agents, accountants and attorneys shall have the right upon prior written notice to Borrower (unless an Event of Default exists, in which case no notice shall be required), to examine and audit, during reasonable business hours, the records, books, management and other papers of Borrower which pertain to its financial condition or the income, expenses and operation of the Property, at the Property or at any office regularly maintained by Borrower where the books and records are located. Lender and its agents shall have the right upon notice to make copies and extracts from the foregoing records and other papers.

Section 11.8.    OTHER RIGHTS. ETC.

(a)    The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Guarantor or any Indemnitor to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the Other Security Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment, changing the rate of interest, or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the Other Security Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to any Property or collateral not in Lender's possession.

(c)    Lender and Trustee may resort for the payment of the Debt to any other security held by or guaranties given to Lender or Trustee in such order and manner as Lender or Trustee, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender or Trustee thereafter to foreclose this Security Instrument, subject to applicable law. The rights of Lender and Trustee under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender or Trustee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Neither Lender nor Trustee shall be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 11.9.    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 11.10.    VIOLATION OF LAWS. If the Property is not in compliance with Applicable Laws, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 11.11.    RIGHT OF ENTRY. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times.

Section 11.12.    SUBROGATION. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's

EXHIBIT B
2049202

obligations hereunder, under the Note and the Other Security Documents and the performance and discharge of the Other Obligations.

## ARTICLE 12. - ENVIRONMENTAL HAZARDS

Section 12.1.    ENVIRONMENTAL DEFINITIONS. For the purpose of this Section, "Environmental Law" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other government directives or requirements, as well as common law, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act and the Resource Conservation and Recovery Act, that apply to Borrower or the Property and relate to Hazardous Materials. "Environmental Liens" means all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person or entity. "Environmental Report" means the written reports resulting from the environmental site assessments of the Property delivered to Lender. "Hazardous Materials" shall mean petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials; radioactive materials; polychlorinated biphenyls ("PCBs") and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials in any form that is or could become friable; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence of which on the Property is prohibited by any federal, state or local authority; any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," or "pollutant" within the meaning of any Environmental Law. "Release" of any Hazardous Materials includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Materials.

Section 12.2.    ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants, that: (a) there are no Hazardous Materials or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with Environmental Laws and with permits issued pursuant thereto (if such permits are required), if any, and (ii) either (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing pursuant to an Environmental Report; (b) there are no past, present or threatened Releases (defined below) of Hazardous Materials in violation of any Environmental Law and which would require remediation by a governmental authority in, on, under or from the Property except as described in the Environmental Report; (c) there is no threat of any Release of Hazardous Materials migrating to the Property except as described in the Environmental Report; (d) there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property except as described in the Environmental Report; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any person or entity (including but not limited to a governmental entity) relating to Hazardous Materials in, on, under or from the Property; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property known to Borrower or contained in Borrower"s files and records, including but not limited to any reports relating to Hazardous Materials in, on, under or migrating to or from the Property and/or to the environmental condition of the Property.

Section 12.3.    ENVIRONMENTAL COVENANTS. Borrower covenants and agrees that so long as Borrower owns, manages, is in possession of, or otherwise controls the operation of the Property: (a) all uses and operations on or of the Property, whether by Borrower or any other person or entity, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Materials in, on, under or from the Property; (c) there shall be no Hazardous Materials in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto, if and to the extent required, and (ii) (A) in amounts not in excess of that necessary to operate the Property or (B) fully disclosed to and approved by Lender in writing; (d) Borrower shall keep the Property free and clear of all Environmental Liens; (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities pursuant to Section 12.4 below, including but not limited to providing all relevant information and making knowledgeable persons available for interviews; (f) Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender, upon Lender's reasonable belief that the Property is not in full compliance with all Environmental Laws, and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties (defined in Section 13.1) shall be entitled to rely on such reports and other results thereof; (g) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) reasonably effectuate remediation of any Hazardous Materials in, on, under or from the Property; and (ii) comply with any Environmental Law; (h) Borrower shall not allow any tenant or other user of the Property to violate any Environmental Law; and (i) Borrower shall immediately notify Lender in writing after it has become aware of (A) any presence or Release or threatened Releases of Hazardous Materials in, on, under, from or migrating towards the Property;

EXHIBIT B

(B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Materials. Any failure of Borrower to perform its obligations pursuant to this Section 12.3 shall constitute bad faith waste with respect to the Property.

Section 12.4.    LENDER'S RIGHTS.  Lender and any other person or entity designated by Lender, including but not limited to any representative of a governmental entity, and any environmental consultant, and any receiver appointed by any court of competent jurisdiction, shall have the right, but not the obligation, to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

Section 12.5.    OPERATIONS AND MAINTENANCE PROGRAMS.  If recommended by the Environmental Report or any other environmental assessment or audit of the Property, Borrower shall establish and comply with an operations and maintenance program with respect to the Property, in form and substance reasonably acceptable to Lender, prepared by an environmental consultant reasonably acceptable to Lender, which program shall address any asbestos containing material or lead based paint that may now or in the future be detected at or on the Property.  Without limiting the generality of the preceding sentence, Lender may require (a) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (b) an amendment to such operations and maintenance program to address changing circumstances, laws or other matters, (c) at Borrower's sole expense, supplemental examination of the Property by consultants specified by Lender, (d) access to the Property by Lender, its agents or servicer, to review and assess the environmental condition of the Property and Borrower's compliance with any operations and maintenance program, and (e) variation of the operations and maintenance program in response to the reports provided by any such consultants.

## ARTICLE 13. - INDEMNIFICATION

Section 13.1.    GENERAL INDEMNIFICATION.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (defined below) imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Applicable Laws; (e) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; or (f) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Security Instrument, INCLUDING, WITHOUT LIMITATION, LOSSES ARISING FROM THE NEGLIGENCE OF THE INDEMNIFIED PARTIES.  Any amounts payable to Lender by reason of the application of this Section 13.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.  The term "Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense).  The term "Indemnified Parties" shall mean (a) Lender, (b) any prior owner or holder of the Note, (c) any servicer or prior servicer of the Loan, (d) any Investor (defined below) or any prior Investor in any Participations (defined below), (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other Creditors Rights Laws proceeding, (g) the Trustee and all subsequent Trustees under this Security Instrument, (h) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Loan.

Section 13.2.    DEED OF TRUST, DOCUMENTARY STAMPS AND/OR INTANGIBLE TAX.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against

EXHIBIT B

any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the Other Security Documents.

Section 13.3.    DUTY TO DEFEND; ATTORNEYS' FEES AND OTHER FEES AND EXPENSES.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding.  Upon demand, Borrower shall pay or, in the sole discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

Section 13.4.    ENVIRONMENTAL INDEMNITY.  As between Borrower and Lender and Borrower and Trustee, all risk of loss associated with non-compliance with Environmental Laws, or with the presence of any Hazardous Material at, upon, within, contiguous to or otherwise affecting the Property, shall lie solely with Borrower.  Accordingly, Borrower shall bear all risks and costs associated with any loss (including any loss in value attributable to Hazardous Materials), damage or liability therefrom, including all costs of removal of Hazardous Materials or other remediation required by Lender or by law.  Borrower shall indemnify, defend and hold Lender and Trustee harmless from and against all loss, liabilities, damages, claims, costs and expenses (including reasonable costs of defense) arising out of or associated, in any way, with the non-compliance with Environmental Laws, or the existence of Hazardous Materials in, on, or about the Property, or a breach of any representation, warranty or covenant contained in Article 12 hereof, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, INCLUDING THOSE ARISING FROM THE JOINT, CONCURRENT, OR COMPARATIVE NEGLIGENCE OF LENDER OR TRUSTEE; however, Borrower shall not be liable under such indemnification to the extent such loss, liability, damage, claim, cost or expense results solely from Lender's or Trustee's gross negligence or willful misconduct.  Borrower's obligations under this Section 13.4 shall arise upon the discovery of the presence of any Hazardous Material, whether or not any governmental authority has taken or threatened any action in connection with the presence of any Hazardous Material, and whether or not the existence of any such Hazardous Material or potential liability on account thereof is disclosed in any site assessment and shall continue notwithstanding the repayment of the Note or any transfer or sale of any right, title and interest in the Property (by foreclosure, deed in lieu of foreclosure or otherwise).

## ARTICLE 14. - WAIVERS

Section 14.1.    WAIVER OF COUNTERCLAIM.  Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Note, any of the Other Security Documents, or the Obligations.

Section 14.2.    MARSHALLING AND OTHER MATTERS.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable state or federal law.

Section 14.3.    WAIVER OF NOTICE.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except (a) with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and (b) with respect to matters for which Lender is required by applicable state or federal law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 14.4.    WAIVER OF STATUTE OF LIMITATIONS.  Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

EXHIBIT B
2049202

Section 14.5.    SOLE DISCRETION OF LENDER.  Wherever pursuant to this Security Instrument (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision to approve or disapprove all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Lender, shall be in the sole discretion of Lender, except as may be otherwise expressly and specifically provided herein.

## ARTICLE 15. - NOTICES

Section 15.1.    NOTICES.  All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery, if delivered in person with receipt acknowledged by the recipient thereof, (b) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed to Borrower or Lender, as the case may be, at the addresses set forth on the first page of this Security Instrument or addressed as such party may from time to time designate by written notice to the other parties; provided, however, notice regarding any proposed foreclosure shall be given in accordance with the requirements hereof and of applicable law.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.  For purposes of this Subsection, "Business Day" shall mean a day on which commercial banks are not authorized or required by law to close in New York, New York.

## ARTICLE 16. - CHOICE OF LAW

Section 16.1.    CHOICE OF LAW.  This Security Instrument and any determination of deficiency judgments shall be governed, construed, applied and enforced in accordance with the laws of the state in which the Property is located and applicable federal law.

Section 16.2.    PROVISIONS SUBJECT TO LAW.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable state or federal law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under any applicable state or federal law.

## ARTICLE 17. - SECONDARY MARKET

Section 17.1.    TRANSFER OF LOAN.  Lender may, at any time, sell, transfer or assign the Note, this Security Instrument and the Other Security Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "Participations") or issue mortgage passthrough certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "Securities").  Lender may forward to each purchaser, transferee, assignee, servicer, participant, or investor in such Participations or Securities (collectively, the "Investor") or any Rating Agency rating such Securities (a "Rating Agency"), each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Guarantor, any Indemnitor(s) and the Property, whether furnished by Borrower, any Guarantor, any Indemnitor(s) or otherwise, as Lender determines necessary or desirable.  Borrower irrevocably waives any and all rights it may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy.

Section 17.2.    COOPERATION.  Borrower, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made pursuant to this Section, including, without limitation, the delivery of an estoppel certificate required in accordance with Subsection 7.4(c) and such other documents as may be reasonably requested by Lender.  Borrower shall also furnish and Borrower, any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or a Rating Agency any and all information concerning the Property, the Leases, the financial condition of Borrower, any Guarantor and any Indemnitor as may be requested by Lender, any Investor or any prospective Investor or any Rating Agency in connection with any sale, transfer or Participations or Securities.

Section 17.3.    RESERVES/ESCROWS.  In the event that Securities are issued in connection with the Loan, all funds

EXHIBIT B
2049202

held by Lender in escrow or pursuant to reserves in accordance with this Security Instrument or the Other Security Documents shall be deposited in eligible accounts at eligible institutions as then defined and required by the Rating Agencies.

## ARTICLE 18. - COSTS

Section 18.1.    PERFORMANCE AT BORROWER'S EXPENSE. Borrower acknowledges and confirms that Lender shall impose certain administrative processing and/or commitment fees in connection with (a) the extension, renewal, modification, amendment and termination of the Loan, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, or (d) the review of any Lease or proposed Lease or the preparation or review of any subordination, non-disturbance agreement (the occurrence of any of the above shall be called an "Event"). Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority. Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise. Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all reasonable attorneys fees of Lender.

Section 18.2.    ATTORNEYS FEES FOR ENFORCEMENT. To the extent allowed by law: (a) Borrower shall pay all reasonable attorneys fees and costs incurred by Lender in connection with (i) the preparation of the Note, this Security Instrument and the Other Security Documents; and (ii) the items set forth in Section 18.1 above, and (b) Borrower shall pay to Lender on demand any and all expenses, including legal fees and costs incurred or paid by Lender, regardless of whether at a pre-trial, trial or appellate level, in protecting its interest in the Property or in collecting any amount payable under the Note, this Security Instrument or the Other Security Documents, or in enforcing its rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder, and whether or not the attorneys fees or costs are incurred at a pre-litigation, litigation or appellate level, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

## ARTICLE 19. - DEFINITIONS

Section 19.1.    GENERAL DEFINITIONS. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Trustee" shall mean "Trustee and any subsequent or substitute trustee(s) named in accordance with the terms of this Security Instrument", the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "Property" shall include any portion of the Property and any interest therein, and the phrases "counsel fees" shall include any and all attorneys", paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender or Trustee in protecting their respective interest in the Property, the Leases and the Rents and enforcing their rights hereunder, whether with respect to retained firms, the reimbursement for the expenses of in-house staff or otherwise.

Section 19.2.    HEADINGS, ETC. The headings and captions of various Articles and Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE 20. - MISCELLANEOUS PROVISIONS

Section 20.1.    NO ORAL CHANGE. This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 20.2.    LIABILITY. If Borrower consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. This Security Instrument shall be binding upon and inure to the benefit of

EXHIBIT B

Borrower and Lender and their respective successors and assigns forever.

Section 20.3.    INAPPLICABLE PROVISIONS.  If any term, covenant or condition of the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Note and this Security Instrument shall be construed without such provision.

Section 20.4.    DUPLICATE ORIGINALS; COUNTERPARTS.  This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Security Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Security Instrument. The failure of any party hereto to execute this Security Instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 20.5.    NUMBER AND GENDER.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 20.6.    COMMERCIAL PROPERTY.  BORROWER COVENANTS AND WARRANTS THAT THE PROPERTY AND IMPROVEMENTS ARE USED BY BORROWER EXCLUSIVELY FOR BUSINESS AND COMMERCIAL PURPOSES. BORROWER ALSO COVENANTS AND WARRANTS THAT THE PROPERTY AND IMPROVEMENTS ARE NOT NOW, AND AT NOT TIME IN THE FUTURE WILL BE, OCCUPIED AS THE PRINCIPAL RESIDENCE OF BORROWER, OR, IF APPLICABLE, BORROWER'S SPOUSE OR BORROWER'S MINOR OR DEPENDENT CHILD.

## ARTICLE 21. -THE TRUSTEE

Section 21.1.    NO LIABILITY.  The Trustee shall not be liable for any error of judgment or act done by the Trustee or be otherwise responsible or accountable under any circumstances whatsoever. The Trustee shall not be personally liable in case of entry by him or anyone acting by virtue of the powers herein granted him upon the Property for debts contracted or liability or damages incurred in the management or operation of the Property. The Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder or believed by him in good faith to be genuine. The Trustee shall be entitled to reimbursement for expenses incurred by him in the performance of his duties hereunder and to reasonable compensation for such of his services hereunder as shall be rendered. Borrower will, from time to time, pay compensation due the Trustee hereunder and reimburse Trustee for and save and hold him harmless from and against any and all loss, cost, liability, damage and expense whatsoever incurred by him in the performance of his duties.

Section 21.2.    RETENTION OF MONEYS.  All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law) and the Trustee shall be under no liability for interest on any moneys received by him hereunder.

Section 21.3.    SUBSTITUTION OF TRUSTEE.  If, for any reason, the Lender shall elect to substitute another for the Trustee herein named (or for any successor to said Trustee), the Lender shall have the right to appoint successor Trustee(s) by duly acknowledged written instruments, and each new Trustee immediately upon recordation of the instrument so appointing him shall become successor in title to the Premises for the uses and purposes of this Deed of Trust, with all the powers, duties and obligations conferred on the Trustee in the same manner and to the same effect as though he were named herein as the Trustee. If more than one Trustee has been appointed, each of such Trustees and each successor thereto shall be and hereby is empowered to act independently.

Section 21.4.    PERFORMANCE OF DUTIES BY AGENTS.  The Trustee may authorize one or more parties to act on his behalf to perform the ministerial functions required of him hereunder, including without limitation, the transmittal and posting of any notices.

EXHIBIT B
2049202

IN WITNESS WHEREOF, this Security Instrument has been executed by Borrower the day and year first above written.

Signed, sealed and delivered
in the presence of:

Borrower(s):

Print Name: Hossein Rezaian

Hossein Rezaian

Print Name: Shahram Rezaian

Print Name: _____

Shahram Rezaian a/k/a Shahran Rezaian

Print Name: _____

This Instrument Prepared by and
Upon Recording Return to:

Antonio Chimienti, Esq.

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

EXHIBIT B
2049202

ACKNOWLEDGMENT

STATE OF UTAH                                    )

                ) ss:

COUNTY OF _SALT LAKE_____                      )

I, _DAVID A. GARRETT_____, certify that Hossein Rezaian and Shahram Rezaian personally came before me this day and acknowledged that he/she executed the foregoing instrument.

Witness my hand and official seal, on February 25, 2005.

_David C. Garrett_____

Notary Public, State of Utah

Print Name: _David A. Garrett_

My Commission Expires: _____

> Notary Public
> **DAVID A. GARRETT**
> 3060 South Lola Circle
> Salt Lake City, Utah 84109
> My Commission Expires
> June 24, 2006
> State of Utah

EXHIBIT B

## EXHIBIT "A"
### File No. 200501046

Commencing 903.54 feet East and 983.44 feet North from the Southwest corner of Section 6 Township 2 South, Range 1 East, Salt Lake Meridian, thence North 50 feet, thence East 150 feet, thence South 50 feet, thence West 150 feet to beginning.

Parcel Number: 22-06-353-006

EXHIBIT B

REDACTED

UPON RECORDING RETURN TO:

Bayview Loan Servicing
4425 Ponce de Leon Blvd., 5th Fl.
Coral Gables, Florida 33146
Attention: Collateral Department

3/2/2005 2:25:00 PM $32.00
Book - 9100 Pg - 7842-7853
Gary W. Ott
Recorder, Salt Lake County, UT
PREFERRED TITLE & ESCROW INS.
BY: eCASH, DEPUTY - EF 12 P.

# ASSIGNMENT OF LEASES AND RENTS

## { UTAH }

### Hossein Rezaian and Shahram Rezaian

**as Assignor**
**(Borrower)**

**To**

### Padron Enterprises,Inc,a California Corp,
### D/B/A Metwest Commercial Lender

**as Assignee**
**(Lender)**

1

EXHIBIT B